Well, Mr. Silver, you thought the crowd was for you. I'm Gilliam, but it's okay. They just make me nervous. We've had the regular crowd shuffle out and have the doors shut before. Yes, sir. Crowds probably make you less nervous than us. Maybe it was a field trip or something. All right, Mr. Gilliam, it looks like the doors are about to shut and we're prepared to proceed. So when you're ready, you may. Sure. Yes, sir. May it please the court, my name is Lucian Gilliam. I represent Cedric Williams in a lawsuit for racial discrimination and retaliation in his demotion from a division labor manager or district labor manager down in Arkansas. Summary judgment is granted, so the standard of review is de novo and all facts are to be interpreted in the light most favorable to my client. The main issue here, I guess, can be boiled down to probably two things. One is that the judge below found that my client did not establish qualification in the prima facie case in his racial discrimination claims. And two, the judge found that intent was not established either at the prima facie or pretext stage of the case. I think both are wrong. On the issue of qualification, when you're making out a McDonnell Douglas prima facie case, you only have to, first of all, it's a low bargain. Second of all, it's inappropriate to require a plaintiff to disprove the legitimate non-discriminatory reasons in the course of establishing qualification. So, and that's essentially what I think the judge did there. My client was a labor manager for nine years. One of the division managers that he worked with indicated that he did a good job, had no problems with him. That was Mr. Usanio. Another division manager named Kelly indicated the same thing. Over at Bryant, a center manager indicated the same thing. If you look at things like the performance of subsequent labor managers, Mr. Lewick and Mr. Holliday, the main issue for Mr. Williams was that he had too many grievances, according to UPS. But Holliday and Lewick both had at least as many, if not more, grievances than my client. So, there's at least a fact issue on qualification, especially given that it's a low burden at the prima facie stage. I would also note that under the Cosette case, qualification is not an element of a retaliation claim at all. Now, moving on to the issue of intent, there's various arguments that have been made there. One is they have argued a lack of knowledge on the part of UPS management that Mr. Williams had engaged in protected activity. The first problem is I don't think that my client was required to prove the knowledge of any specific manager. If you look at the broadest case, and there's another one we cited that the name escapes me at the moment. But what you have to do is establish corporate knowledge, not a specific individual's knowledge. Now, if we were suing Rue individually under 1981, I think that would be a different matter. But that's not what's happening here. Two is that my client gave specific testimony that he had two different times talked to the district HR manager, Stan Rue, and said in the case of Mr. Barefield, Mr. Rue had told him Barefield's a troublemaker and he plays the race card. And Mr. Williams said, look, complaints of discrimination cannot be a factor here, and you can't do that. Now, that is when my client started having trouble and complaints about his performance. And it went on for a relatively long period of time. But Mr. Kelly, who was a division manager that worked with Cedric Williams, indicated that Stan Rue was basically subjecting my client to closer supervision, that he was trying to lay a false paper trail on Mr. Williams. And in the Graves versus Stone case that we cited, that sort of long kind of period of hostilities where you keep coming after somebody was indicated to be an indicator, a pretext, and summary judgment was reversed in that case. Then, shortly before my client was put on a performance improvement plan, there was a gentleman named Sandford who had brought grievances, and my client indicated to Mr. Rue again, and this is something my client provided testimony about, once again, Mr. Williams indicated to Mr. Rue that, look, you're terminating Sandford for falsification. There are Caucasians out there who have committed falsification and have not been terminated, and you can't treat people differently. That's a racial discrimination issue. And he advised later on would ultimately testify in Mr. Sandford's case, and subsequent to that deposition indicates to Mr. Rue that we need to settle this case. There's a discrimination issue here. There what? That there's a discrimination issue here. And so that was shortly after his deposition, and soon my client, Mr. Williams, would be on a PIP. Well, doesn't the record also show that counsel in that deposition said that your client helped the company and was helpful for the company's defenses? That is true as well. That is true as well, certainly. I mean, there's no allegation that he sold out the company or testified untruthfully or anything else. I mean, he did his job there, and the company acknowledged it. That's true. That's true. I think it's the subsequent statement that we need to settle this case and that there's a discrimination problem internally that got him in trouble, not the deposition testimony, but they were close together. Now, having said that, you know, at summary judgment, I mean, at trial, that's certainly an argument for UPS to make, but at summary judgment, when inferences are to be made in my client's favor, the closeness in timing to his statement that there's a discrimination problem subsequent to the deposition should be accorded some weight, and no favorable inference should be drawn from the fact that they're saying that he did fine in the deposition. So I think on that issue, the summary judgment standard requires working in my client's favor, drawing favorable inferences for him there. This may be, and it's probably in the record, but just remind me. Your client was not terminated. He was demoted, right? Demoted. That still works for UPS? Yes, sir. Yes, sir. What was he demoted? He was labor manager. Was that the title? District labor manager. Yes, sir. And what did the demotion mean to him in terms of job responsibility, salary, and so on? Well, he would have lost salary. He would have been at a lower level of responsibility. Ultimately, it impairs his abilities to get promoted. It's going to affect his retirement. Now, I don't know how much of that is in the record. Well, I thought the record shows it was the same salary, and he lost some incentive possibility. Yeah, but that's a significant amount of money. At UPS, that's a lot of money. Is the amount of money in the record? I'm not sure about that. I'm not sure about that. But they didn't really dispute that my client suffered an adverse action, and the court didn't find that my client did not suffer an adverse action. So I just don't think that's the issue on appeal here. I think this is an issue of intent, basically, and then qualification also. Now, if we look at the record, there's also the issue of going back to it. They've argued that Stan Rue didn't know that he wasn't involved, that he wasn't important in this. But once again, if you look at the record, Mr. Rue testified that he had veto power. Now, he immediately corrected that, but, you know, people won't back bad statements after they realize they've made them all the time. We still get to rely on his statement that he had veto power. He testified that he had influence over Judy Henry. He testified that his say-so was required in order to demote my client, Mr. Williams. Ms. Henry herself, the district manager, testified that she relies on and trusts Stan Rue. So, you know, he is at play here. And then when you look at Naaman Kelly's testimony, who's a division manager that worked with my client, and the structure is division manager, district manager, is above the division. Naaman Kelly indicated that Stan Rue and others were coming to him and asking him to downwardly adjust Cedric Williams' QPR, which is like an evaluation, so that they could get him in trouble, put him on a pin. And Mr. Kelly felt that that was not warranted, and he said that this is the only person he's ever been asked to do this for. If you look at Mr. Holliday, his testimony, he is one of the two subsequent Caucasians who was a district labor manager after my client, who replaced my client. And that replacement by Caucasians alone should make out a prima facie case on racial discrimination. But in any event, there was extensive testimony from Mr. Holliday on how these labor numbers were calculated, grievances, things like that. And Mr. Holliday indicated that the grievances were just as high under him and Mr. Lewick as they were under Cedric Williams. Yet nothing happened to either Holliday or Lewick. I mean, the allegations against your client of substandard conduct were more than just that, right? I mean, there was a failure to respond to emails, for example, a repeated failure to respond to direction. In other words, there was more than just the number of grievances at play in your client's demotion. They had other allegations they made against him, but I think the primary two were just failure to get these grievances under control. Well, there were four in the PIP, weren't there? Or am I misremembering? That sounds about right. There was also an alleged lack of respect by division managers, but there were only three that he worked with, Kelly, Usanio, who indicated they had no problem with him in battle in Arkansas. In addition, I don't think that we have to disprove every single reason to establish an aspect of a legitimate nondiscriminatory reason. We don't have to disprove every aspect to establish pretext. And there's a maxim, false in one, false in all, which Shaker versus Upjohn is a Seventh Circuit case on the issue, where they basically say, look, if you disprove part of the legitimate nondiscriminatory reason, it puts everything into doubt, which I think we've done. I'm going to sit down now. Thank you. Thank you. Mr. O'Toole, when you're ready. Good morning, Your Honor. Dan O'Toole on behalf of the United Parcel Service. I would like to address a couple of things raised by my opponent. First, he has questioned whether the judge appropriately concluded that Mr. Williams established a prima facie case of discrimination based on his qualifications. I think there's a lot of evidence in the record that Mr. Williams was not qualified, given the numerous deficiencies in his work performance. But even if he could establish that case, the judge's opinion, Judge Sibel's opinion, is clear at pages 17 and 19 of the addendum, where he says, even if the plaintiff establishes a prima facie case of discrimination, the plaintiff has done nothing to rebut the legitimate nondiscriminatory reason. So that's not even an issue in this case, because the judge had alternative grounds for his holding. There was a statement also made that this employee, that Stan Rue, who is allegedly a decision maker, and we can discuss that a little later, but that Mr. Rue had made a statement about a Rodney Barefield being someone who played the race card. A couple of points with respect to that. First of all, there is a statement in the record, and it's the plaintiff's affidavit, Mr. Williams' affidavit, that alleges that Mr. Rue made that comment. The statement made here was that Cedric Williams, the appellant, went further and said, we can't do this, we can't take action against him based on that basis, race can't be a factor in our decisions. There is no evidence in the record at all to support those additional statements. The one statement that Cedric Williams did allege in his affidavit was that Mr. Rue made the allegation that Rodney Barefield plays the race card. The important point that the district court noted is that Cedric Williams in his deposition testimony said, I agree that Rodney Barefield plays the race card all the time. In fact, Mr. Williams, who is an African American man, called Mr. Barefield a race baiter and said he agreed that he was a race baiter and he played the race card. There is no suggestion whatsoever that Mr. Williams was in any way protesting this alleged statement or somehow engaging in protected activity in that regard. There was another statement made here that Naaman Kelly, who was also a division manager, was a witness to some sort of effort by Mr. Rue, the HR manager, to create a paper trail on Cedric Williams. This has nothing whatsoever to do with the case that was before the district court. Mr. Kelly, this division manager, was Mr. Williams' superior after Mr. Williams was demoted out of that job. In fact, I think it was two jobs later when he came under Mr. Kelly. Mr. Kelly, who has his own set of issues with the company, was deposed by the plaintiff's attorney and said, I think that one of the things that Stan Rue asked me to do with respect to Mr. Williams was wrong. So that has no effect on this decision that is at issue here. The other statement that was made here is that Mr. Williams allegedly said that you are firing Mr. Sandiford for falsification and whites have done the same thing. They haven't been fired and there's a discrimination problem. That is not in the record at all. In fact, Mr. Williams was specifically asked in his deposition, did you ever say to anyone in management at the company that I think we are discriminating against Rodney Barefield? I didn't use the word discrimination, but I would say, and I'm trying to get them to understand, you have to do it the right way. Now, when I say do it the right way, I'm pretty much telling them you have to be consistent. Mr. Williams was the labor manager for the company and he admits, and that's at page 213 of the appendix, he admits that he wanted more than anybody to fire Mr. Barefield because he thought he was a troublemaker and a race baiter and a terrible employee. So to suggest somehow that Mr. Williams was protesting on behalf of Mr. was protesting with respect to Mr. Barefield is inaccurate. The other piece is this. The overwhelming majority of the plaintiff's briefing in this case before this court relates to an affidavit that was submitted by a Susan Norwood. That affidavit was never before the district court. In fact, the district court had established a date as April 2nd for the briefing to be concluded in this manner. Three days before, I'm sorry, on November, March 30th, counsel for Senator Williams contacted me. He had indicated that he wanted to get an affidavit from Susan Norwood. I told him that same afternoon, within about two hours, that's fine. We have no objection to you doing that. He did not get that affidavit and instead, after receiving two extensions of time, filed his summary judgment opposition on April 9th. We filed our reply brief on April 16th and the matter was submitted to court. It wasn't until May 23rd, a full five weeks after the summary judgment briefing was concluded, that Mr. Williams' counsel first asked the court, the district court, to reopen the briefing so that he could supplement his summary judgment briefing with information that he had received from a Susan Norwood. That's at appendix 1301. The motion did not set forth any affidavit, did not tell the district court why Susan Norwood's deposition testimony was important. In fact, when we responded to that, we said that the plaintiff knew about Susan Norwood before they filed their responsive brief and, for whatever reason, didn't file anything in the responsive brief. The district court denied that motion on the basis of the untimeliness of the motion, the delay in seeking to present evidence, and the failure to show that the proposed witness even had any relevant evidence. That's in the district court's order at 1319 of the appendix. It wasn't until the middle of June, June 19th of 2018, after the summary judgment briefing had already been concluded, that the Susan Norwood affidavit first appears. And it doesn't appear as a submission to the district court in support of the summary judgment motion or in opposition to it. It appears as a separate attachment to a motion for sanctions that the plaintiff's counsel filed in this case. And the district court denied that motion. And again, in that... Well, that's where it appears. Doesn't the first paragraph of it say that it is submitted in support of the summary judgment motion? If it does, Your Honor, I have overlooked that. But I could understand how the district court might overlook it because it is presented to the judge as an exhibit in support of a motion for sanctions. Right. That's where it was. But I'm reading the first paragraph which does say, My name is Susan Norwood and I make this declaration in support of Cedric Williams' response to the motion for summary judgment. Okay. That's unfair. I'm sorry. I've got it right in front of me. No, no, no. I appreciate that. Well, the... I also understand your contention that given its location, it could have been a pearl lost amongst a whole bunch of other stuff. Which is particularly relevant in this lawsuit given the volume of materials that were before the district court, including the response to our statement of undisputed material facts, which piled layer upon layer upon layer of additional allegations upon the district court with no support whatsoever in the record, with no citation to the appropriate places in the record. And when there were citations, they were often wrong. And the district court appropriately deemed all of the defendant's 25 undisputed material facts to be admitted. And I'll note too that in this appeal, one of the things that the plaintiff has challenged in this appeal is not the district court's conclusion to deem all of those facts admitted. So all of those facts are admitted. And it's clear too that the notice of appeal only appeals from the summary judgment ruling itself. Let me ask you one question. Your opposing counsel made the representation that you're not appealing the determination that there's an adverse action. Is that correct? There was an adverse action. Okay. We agree that the demotion is an adverse action. It didn't involve a change in pay, but the benefit opportunities, the stock type benefit opportunities. Okay. But the other thing too is in that motion for discovery sanctions, when the Norwood affidavit first appeared, there was an additional representation by plaintiff's counsel that Susan Norwood had just retained plaintiff's counsel as an attorney and had just given authorization to use this information. And the district court at page 1383 found that representation to be misleading because it directly contradicted what had previously been told to the court in the motion to supplement the summary judgment record, which showed that on March 30th of 2018, the plaintiff's counsel told me, I represent her and I'm going to get an affidavit from her. And I said, fine. And that information was before the district court. And that caused the district court to say a month and a half later, when you again said she just retained me, this is new evidence that I want to introduce to the court that that was misleading. The other piece too that the district court said was misleading is the repeated references, I think it's 13, 14 times in all the briefing about Stan Rue, who's not a decision maker in this case, allegedly having veto authority over somebody, over the district manager. The court found that that citation to a portion of the deposition was misleading at best. That's at the addendum, page 15. And I think it's important to understand too the context in which that whole discussion occurred. It had nothing to do with this case. Stan Rue was deposed as a 30B6 corporate representative and he was being asked about a termination, a potential termination decision involving another employee in which the district president originally said, I think we ought to fire him. Stan Rue said, I didn't think it was the right decision. So I went, gathered additional information, talked to other people, presented that additional information to the district president. The district president decided not to terminate that employee. So there's no support whatsoever for any suggestion that Stan Rue has veto authority or that Stan Rue played anything other than an HR administrative role in this case. There are no other questions. I will sit down. Thank you. Thank you. Well, there's no support for Stan Rue having veto authority over a personnel decision except his sworn testimony that yes, he had veto authority over Judy Henry's decisions. There's no support that he was involved except that he said that he had to approve the decision in Cedric Williams. Except that he said that HR had to be involved in every personnel decision in that district. There's no support that he was involved except that he said that she relies on him and that Ms. Henry said that she relies on and trusts him. So other than their sworn testimony, there's no support at all, I guess. I don't see how that is misleading. It's summary judgment. We're entitled to favorable inferences. Those are the facts in the record and those are the inference that should be drawn is that Stan Rue was involved and that he did have veto authority because he said it under oath. Now, as to this issue of purportedly being misleading about Ms. Norwood, she's our client. We can't do things without our permission. We did not have permission from her to get that affidavit. That's the end of it. There wasn't anything misleading about that. Counsel, was it in the record at summary judgment, the affidavit? The affidavit, it was not filed in support. We filed a response to the motion for summary judgment. It was not filed in support of that at the time of the filing. We did not get permission to get an affidavit and use an affidavit from Ms. Norwood until well after our response had been filed. Now, then when we did file it in support of the motion for sanctions, it was also in support of the summary judgment motion, as it states in the first paragraph, as Judge Erickson noted. It was out of time. Did the district court admit that into the record subsequently? No, it refused to consider it. It said it was too late, basically. Did you appeal that decision in whatever order it was? We appealed the summary judgment order, and I would consider that to be an appeal of your failure to consider that affidavit, which was submitted in support of the summary judgment motion as well. Thank you. Thank you.